MAGELLAN INTERNATIONAL
CORPORATION, Plaintiff,

v.

SALZGITTER HANDEL
GmbH, Defendant.

No. 99 C 5153.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 7, 1999.

Robin R. Lunn and Angela Elbert Dietz of Neal, Gerber & Eisenberg, Chicago, IL, for plaintiff.

Julian Solotorovsky, Stephen A. Wood and Alyson T. Todd of Kelley Drye & Warren LLP, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Salzgitter Handel GmbH ("Salzgitter") has filed a motion pursuant to Fed. R.Civ.P. ("Rule") 12(b)(6) ("Motion"), seeking to dismiss this action brought against it by Magellan International Corporation ("Magellan"). Because the allegations in Complaint Counts I and II state claims that are sufficient under Rule 8(a), Salzgitter's Motion must be and is denied as to those claims. Count III, however, is deficient and is therefore dismissed without prejudice.

### Facts

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, this Court accepts all of Magellan's well-pleaded factual allegations as true, as well as drawing all reasonable inferences from those facts in Magellan's favor (*Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir.1996)). What follows is the version of events set out in the Complaint, when read in that light.

### Offers, Counteroffers and Acceptance

Magellan is an Illinois-based distributor of steel products. Salzgitter is a steel trader that is headquartered in Dusseldorf, Germany and maintains an Illinois sales office. In January 1999[1] Magellan's Robert Arthur ("Arthur") and Salzgitter's Thomas Riess ("Riess") commenced negotiations on a potential deal under which Salzgitter would begin to act as middleman in Magellan's purchase of steel bars—manufactured according to Magellan's specifications—from a Ukrainian steel mill, Dneprospetsstal of Ukraine ("DSS").

By letter dated January 28, Magellan provided Salzgitter with written specifications for 5,585 metric tons of steel bars, with proposed pricing, and with an agreement to issue a letter of credit ("LC") to Salzgitter as Magellan's method of payment. Salzgitter responded two weeks later (on February 12 and 13) by proposing prices $5 to $20 per ton higher than those Magellan had specified.

On February 15 Magellan accepted Salzgitter's price increases, agreed on 4,000 tons as the quantity being purchased, and added $5 per ton over Salzgitter's numbers to effect shipping from Magellan's preferred port (Ventspills, Latvia). Magellan memorialized those terms, as well as the other material terms previously discussed by the parties,[2] in two February 15 purchase orders. Salzgitter then responded on February 17, apparently accepting Magellan's memorialized terms except for two "amendments" as to prices. Riess asked for Magellan's "acceptance" of those two price increases by return fax and promised

---

1. Because all the relevant events took place this year, all further date references will omit "1999."

2. Price, quantity, delivery date, delivery method and payment method had all been negotiated and agreed to by the parties.

to send its already-drawn-up order confirmations as soon as they were countersigned by DSS. Arthur consented, signing and returning the approved price amendments to Riess the same day.

On February 19 Salzgitter sent its pro forma order confirmations to Magellan. But the general terms and conditions that were attached to those confirmations differed in some respects from those that had been attached to Magellan's purchase orders, mainly with respect to vessel loading conditions, dispute resolution and choice of law.

Contemplating an ongoing business relationship, Magellan and Salzgitter continued to negotiate in an effort to resolve the remaining conflicts between their respective forms. While those fine-tuning negotiations were under way, Salzgitter began to press Magellan to open its LC for the transaction in Salzgitter's favor. On March 4 Magellan sent Salzgitter a draft LC for review.[3] Salzgitter wrote back on March 8 proposing minor amendments to the LC and stating that "all other terms are acceptable." Although Magellan preferred to wait until all of the minor details (the remaining conflicting terms) were ironed out before issuing the LC, Salzgitter continued to press for its immediate issuance.

On March 22 Salzgitter sent amended order confirmations to Magellan. Riess visited Arthur four days later on March 26 and threatened to cancel the steel orders if Magellan did not open the LC in Salzgitter's favor that day. They then came to agreement as to the remaining contractual issues.[4] Accordingly, relying on Riess's assurances that all remaining details of the deal were settled, Arthur had the $1.2 million LC issued later that same day.

*Post–Acceptance Events*

Three days later (on March 29) Arthur and Riess engaged in an extended game of "fax tag" initiated by the latter. Essentially Salzgitter demanded that the LC be amended to permit the unconditional substitution of FCRs for bills of lading—even for partial orders—and Magellan refused to amend the LC, also pointing out the need to conform Salzgitter's March 22 amended order confirmations to the terms of the parties' ultimate March 26 agreement. At the same time, Magellan requested minor modifications in some of the steel specifications. Salzgitter replied that it was too late to modify the specifications: DSS had already manufactured 60% of the order, and the rest was under production.

Perhaps unsurprisingly in light of what has been recited up to now, on the very next day (March 30) Magellan's and Salzgitter's friendly fine-tuning went flat. Salzgitter screeched an ultimatum to Magellan: Amend the LC by noon the following day or Salzgitter would "no longer feel obligated" to perform and would "sell the material elsewhere." On April 1 Magellan requested that the LC be canceled because of what it considered to be Saltzgitter's breach. Salzgitter returned the LC and has since been attempting to sell the manufactured steel to Magellan's customers in the United States.

*Magellan's Claims*

Complaint Count I posits that—pursuant to the Convention—a valid contract existed between Magellan and Salzgitter before Salzgitter's March 30 ultimatum. Hence that attempted ukase is said to have amounted to an anticipatory repudiation of that contract, entitling Magellan to relief for its breach.

Count II seeks specific performance of the contract or replevin of the manufac-

---

**3.** One of the LC terms—also included in Magellan's purchase orders—required ocean bills of lading to be presented as a condition precedent to Salzgitter's right to draw on the LC. But Salzgitter was permitted to substitute Forwarder's Certificates of Receipt ("FCR")for bills of lading as to the full order

if Magellan were to be more than 20 days late in providing a vessel for shipment.

**4.** For example, the parties agreed that the contract would be governed by the United Nations Convention on the International Sale of Goods (the "Convention").

tured steel. That relief is invoked under the Illinois version of the Uniform Commercial Code ("UCC," specifically 810 ILCS 5/2–716)[5] because Magellan is "unable to 'cover' its delivery commitments to its customers without [un]reasonable delay" (Complaint ¶ 42).

Finally, Count III asserts that specifications given to Salzgitter for transmittal to DSS constitute "trade secrets" pursuant to the Illinois Trade Secrets Act ("Secrets Act," which defines the term "trade secret" at 765 ILCS 1065/2(d)). Salzgitter is charged with misappropriation of those trade secrets in attempting to sell the manufactured steel embodying those secrets to Magellan's customers (Complaint ¶¶ 9, 45–47). Magellan relatedly claims that the threat of future disclosure and use of those asserted trade secrets by Salzgitter causes Magellan irreparable harm (Complaint ¶ 49).

### Documentary Grist for the Motion Mill

As an initial matter, Magellan's Response to Defendant's 12(b)(6) Motion To Dismiss ("Response") includes a request that Salzgitter's Rule 12(b)(6) pleading motion be converted to one for summary judgment under Rule 56, with Magellan

5. Although Magellan's contention that Illinois law governs its specific performance claim seems at odds with the framing of its breach of contract claim under the Convention, any presumed conflict in that regard would not pose a problem, because Rule 8(e) expressly permits inconsistency in pleading. But as it turns out, in light of the appropriate analysis of the Convention's terms discussed below, Magellan's contention is on the mark anyway.

6. This Court had admonished Magellan at the last status conference on September 8 that any such conversion argument should be advanced at a much earlier date than its current Response. Nevertheless, this opinion's resolution of the conversion motion rests on grounds independent of such noncompliant conduct.

7. This Court is the author of Chapter 12 of the revised Third Edition of *Moore's Federal Practice* ("*Moore's*"), a total rewrite of that treatise completed in 1997 (in addition to this Court's having served as the editorial reviewer of a number of chapters of the treatise authored by others). 2 *Moore's* § 12.34[3]

thus having the right to obtain further evidence under Rule 56(f) to support the Response.[6] It is of course true that such an option is made available to a court under Rule 12(b) where "matters outside the pleading are presented to and not excluded by the court." But that alternative seldom makes sense at the threshold stage of any litigation (see, e.g., *Rodi v. Society Nat'l Bank*, No. 97 C 8441, 1998 WL 61200, at *1 (N.D.Ill. Feb. 9, 1998)—and even then it is ordinarily considered at the instance of a moving defendant, not a responding plaintiff).[7] Just so, Magellan's invitation is declined here.

■ Indeed, even apart from that last-mentioned consideration, the quoted Rule 12(b) language does not come into play in this case because the Salzgitter exhibits are not really "matters outside the pleading." That is so because the Complaint refers expressly or implicitly to all of the exhibits added to the Salzgitter Motion. Hence those exhibits can properly be considered as part of the pleadings (see, e.g., *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993); *In re Stac Elec. Securities Litig.*, 82 F.3d 1480, 1487 n. 4 (9th Cir.1996)).[8]

addresses the subject of converting a Rule 12(b)(6) motion to one for summary judgment under Rule 56, and its entire thrust is properly directed toward such efforts by the movant seeking dismissal.

8. This ruling should not be misunderstood as buying into Salzgitter's main contention that those exhibits reveal the parties' clear intent not to be bound until a final draft of the contract was executed. Any such inquiry into the parties' intentions must be reserved for trial, as counseled by such cases as *Ronan Assocs., Inc. v. Local 94–94A–94B, Int'l Union of Operating Eng'rs*, 24 F.3d 447, 449 (2d Cir.1994):

Under traditional principles of contract law, questions as to what the parties said, what they intended, and how a statement by one party was understood by the other are questions of fact. . . .

Because Magellan's statements contained in Salzgitter's exhibits are far from being an admission of its intent not to be bound (indeed, they are as easily interpreted as indications of a contrary intent), they will not be

■ Magellan's counter-argument that those exhibits are somehow not central to its claims strikes a hollow note. When parties engage in a chain of correspondence relating to a transaction within a short period of time, and then one party detaches and presents only certain links of the chain in its effort to state a claim for relief, the party against whom such an incomplete picture is painted is entitled to fill in the skeletal outline thus presented by the complaining party by adding the missing links (see Fed.R.Evid. ("Evid. Rule") 106).

In this instance Magellan and Salzgitter corresponded no fewer than 16 times within a two-month time span (January 28 to March 31). Magellan asks this Court to take into account the 5th, 6th, 7th, 10th, 11th, 12th and 15th items in that sequence, while ignoring the 1st through 4th, 8th, 9th, 14th, and 16th items. Though this Court is duty-bound at this stage of the game to look at the picture of the parties' transaction (as framed by their correspondence) through a lens most favorable to Magellan, it cannot do so by examining only half of that picture in that light.

Evid.Rule 106's embodiment of the evidentiary rule of completeness seeks to avoid the "misleading impression created by taking matters out of context" (see 1972 Advisory Committee Note to Evid.Rule 106). And it is no less important to insist on a complete picture in ruling on the current motion to dismiss than to do so on a motion to admit evidence at trial. Even to a greater extent than the rule of completeness in the latter context recognizes the "inadequacy of repair work when delayed to a point later in the trial" (*id.*), it would be totally wasteful to uphold a claim

on the false premise created by less than complete documentation when the delayed consideration of the remaining documents would lead to dismissal of that claim.

### *Rule 12(b)(6) Standard*

This opinion began by citing *Travel All Over the World,* 73 F.3d at 1429–30 for the rule applicable to Rule 12(b)(6) scrutiny of a complaint (and see also such cases as *Sanner v. Board of Trade,* 62 F.3d 918, 925 (7th Cir.1995)). *Scott v. City of Chicago,* 195 F.3d 950, 951 (7th Cir.1999) (internal quotation marks and numerous citations omitted) has described the threshold notice pleading standard:

> Federal notice pleading requires the plaintiff to set out in her complaint a short and plain statement of the claim that will provide the defendant with fair notice of the claim. However, a complaint need not spell out every element of a legal theory to provide notice.... A pleading need contain only enough to allow the defendant to understand the gravamen of the plaintiff's complaint.

Thus no claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" (*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### *Count I: Breach of Contract*

*Choice of Law*

As stated earlier, Magellan first claims entitlement to relief for breach of contract. Because the transaction involves the sale and purchase of steel—"goods"—the parties acknowledge that the governing law is either the Convention[9] or the UCC.[10] Un-

---

considered as such admissions in deciding the Motion.

**9.** 15 U.S.C.A.App. (West 1998) includes the text of the Convention and various related materials. As Convention Art. 1 provides, it applies where Magellan and Salzgitter constitute "parties whose places of business are in different States" and where they did not opt out of Convention application under its Art. 6.

**10.** Salzgitter seeks to rely upon several cases decided pursuant to the Illinois common law of contracts. As Magellan correctly points out, such reliance is misplaced in sales-of-goods cases such as this one. Instead the UCC would apply if the Convention did not and if Illinois choice of law rules pointed to the application of Illinois law (*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)).

der the facts alleged by Magellan, the parties agreed that Convention law would apply to the transaction, and Salzgitter does not now dispute that contention. That being the case, this opinion looks to Convention law.[11]

*Pleading Requirements*

■ As n. 11 reflects, the specification of the pleading requirements to state a claim for breach of contract under the Convention truly poses a question of first impression. Despite that clean slate, even a brief glance at the Convention's structure confirms what common sense (and the common law) dictate as the universal elements of any such action: formation, performance, breach and damages. Hence under the Convention, as under Illinois law (or the common law generally), the components essential to a cause of action for breach of contract are (1) the existence of a valid and enforceable contract containing both definite and certain terms, (2) performance by plaintiff, (3) breach by defendant and (4) resultant injury to plaintiff.[12] In those terms it is equally clear that Magellan's allegations provide adequate notice to

Salzgitter that such an action is being asserted (Complaint ¶¶ 7–15).

Formation of a contract under either UCC or the Convention requires an offer followed by an acceptance (see Convention Pt. II). Although analysis of offer and acceptance typically involves complicated factual issues of intent—issues not appropriately addressed on a motion to dismiss—this Court need not engage in such mental gymnastics here. It is enough that Magellan has alleged facts that a factfinder could call an offer on the one hand and an acceptance on the other.

Under Convention Art. 14(1) a "proposal for concluding a contract addressed to one or more specific persons constitutes an offer if it is sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance." So, if the indications of the proposer are sufficiently definite and justify the addressee in understanding that its acceptance will form a contract, the proposal constitutes an offer (*id.* Art. 8(2)). For that purpose "[a] proposal· is sufficiently definite if it indicates the goods and expressly or implicitly makes provision for determining the quantity and the price" (*id.* Art. 14(1)).[13]

**11.** As of the date of this opinion, only seven United States courts' opinions available in published opinions or via Westlaw have interpreted substantive provisions of the Convention, and none of those opinions has addressed the pleading requirements for a breach of contract action. See *MCC–Marble Ceramic Ctr., Inc. v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384 (11th Cir.1998), holding the parol evidence rule inapplicable under the Convention; *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024 (2d Cir.1995), calculating the damages available to a buyer under the Convention when the seller delivered nonconforming goods; *Medical Marketing Int'l, Inc. v. Internazionale Medico Scientifica, S.R.L.*, No. CIV.A. 99–0380, 1999 WL 311945 (E.D.La. May 17, 1999), interpreting the Convention's Art. 35 public laws and regulations provision; *Mitchell Aircraft Spares, Inc. v. European Aircraft Serv. AB*, 23 F.Supp.2d 915 (N.D.Ill.1998), following *MCC–Marble; Calzaturificio Claudia s.n.c. v. Olivieri Footwear Ltd.*, No. 96 Civ. 8052(HB) (THK), 1998 WL 164824 (S.D.N.Y. Apr. 7, 1998), applying the Convention rules eliminating statute of frauds and the parol evidence rule; *Helen Kaminski Pty. Ltd. v. Mar-*

*keting Australian Prods., Inc.*, Nos. M–47 (DLC), 96B46519, 97–8072A, 1997 WL 414137 (S.D.N.Y. July 23, 1997), holding that the Convention's scope did not extend to a distributorship agreement; *Filanto, S.p.A. v. Chilewich Int'l Corp.*, 789 F.Supp. 1229 (S.D.N.Y.1992), interpreting the battle-of-forms provision of Convention Art. 19 and noting the Convention's lack of statute of frauds and parol evidence rules.

**12.** See, e.g., Convention Pt. II (formation of contract) and Pt. III (performance, breach and injury); *Stedman v. Hoogendoorn, Talbot, Davids, Godfrey & Milligan*, 843 F.Supp. 1512, 1517 (N.D.Ill.1994), vacated by unpublished order (reported in table at 61 F.3d 906, 1995 WL 431385 (7th Cir.1995)) on other grounds.

**13.** See generally John E. Murray, Jr., *Essay on the Formation of Contracts and Related Matters under the United Nations Convention on Contracts for the International Sale of Goods*, 8 J.L. & Com. 11, 13–26 (offer), 27–38 (acceptance), 38–44 (battle of forms), 48–50 (modifications) (1988).

In this instance Magellan alleges that it sent purchase orders to Salzgitter on February 15 that contained the material terms upon which the parties had agreed. Those terms included identification of the goods, quantity and price. Certainly an offer could be found consistently with those facts.

But Convention Art. 19(1) goes on to state that "[a] reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer." That provision reflects [14] the common law's "mirror image" rule that the UCC has rejected (see *Filanto*, 789 F.Supp. at 1238). And Salzgitter's February 17 response to the purchase orders did propose price changes. Hence that response can be seen as a counteroffer that justified Magellan's belief that its acceptance of those new prices would form a contract.

Although that expectation was then frustrated by the later events in February and then in March, which in contract terms equated to further offers and counteroffers, the requisite contractual joinder could reasonably be viewed by a factfinder as having jelled on March 26. In that respect Convention Art. 18(a) requires an indication of assent to an offer (or counteroffer) to constitute its acceptance. Such an "indication" may occur through "a statement made by or other conduct of the offeree" (*id.*). And at the very least, a jury could find consistently with Magellan's allegations that the required indication of complete (mirrored) assent occurred when Magellan issued its · LC on March 26. So much, then, for the first element of a contract: offer and acceptance.

Next, the second pleading requirement for a breach of contract claim—performance by plaintiff—was not only specifically addressed by Magellan (Complaint ¶ 39) but can also be inferred from the facts alleged in Complaint ¶ 43 and from Magellan's prayer for specific performance. Magellan's performance obligation as the buyer is simple: payment of the price for the goods. Magellan issued its LC in satisfaction of that obligation, later requesting the LC's cancellation only after Salzgitter's alleged breach (Complaint ¶¶ 24, 31). Moreover, Magellan's request for specific performance implicitly confirms that it remains ready and willing to pay the price if such relief were granted.

As for the third pleading element—Salzgitter's breach—Complaint ¶ 38 alleges:

Salzgitter's March 30 letter (Exhibit G) demanding that the bill of lading provision be removed from the letter of credit and threatening to cancel the contract constitutes an anticipatory repudiation and fundamental breach of the contract.

It would be difficult to imagine an allegation that more clearly fulfills the notice function of pleading.

Convention Art. 72 addresses the concept of anticipatory breach:

(1) If prior to the date for performance of the contract it is clear that one of the parties will commit a fundamental breach of contract, the other party may declare the contract avoided.

(2) If time allows, the party intending to declare the contract avoided must give reasonable notice to the other party in order to permit him to provide adequate assurance of his performance.

(3) The requirements of the preceding paragraph do not apply if the other party has declared that he will not perform his obligations.

And Convention Art. 25 states in relevant part:

A breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract. . . .

■ That plain language reveals that under the Convention an anticipatory repudiation pleader need simply allege (1)

14. Bad pun intended.

that the defendant intended to breach the contract before the contract's performance date and (2) that such breach was fundamental. Here Magellan has pleaded that Salzgitter's March 29 letter indicated its pre-performance intention not to perform the contract, coupled with Magellan's allegation that the bill of lading requirement was an essential part of the parties' bargain. That being the case, Saltzgitter's insistence upon an amendment of that requirement would indeed be a fundamental breach.

Lastly, Magellan has easily jumped the fourth pleading hurdle—resultant injury. Complaint ¶ 40 alleges that the breach "has caused damages to Magellan."

### Count II: Specific Performance or Replevin

■ Convention Art. 46(1) provides that a buyer may require the seller to perform its obligations unless the buyer has resorted to a remedy inconsistent with that requirement. As such, that provision would appear to make specific performance routinely available under the Convention. But Convention Art. 28 conditions the availability of specific performance:[15]

> If, in accordance with the provisions of this Convention, one party is entitled to require performance of any obligation by the other party, a court is not bound to enter judgment for specific performance unless the court would do so under its own law in respect of similar contracts of sale not governed by this Convention.

Simply put, that looks to the availability of such relief under the UCC. And in pleading terms, any complaint adequate to provide notice under the UCC is equally sufficient under the Convention.

■ Under UCC § 2–716(1) a court may decree specific performance "where the goods are unique or in other proper circumstances."[16] That provision's Official Commentary instructs that inability to cover should be considered "strong evidence" of "other proper circumstances." UCC § 2–716 was designed to liberalize the common law, which rarely allowed specific performance (see, e.g., 4A Ronald A. Anderson, *Uniform Commercial Code* § 2–716: 11 (3d ed.1997)). Basically courts now determine whether goods are replaceable as a practical matter—for example, whether it would be difficult to obtain similar goods on the open market (see generally Andrea G. Nadel, Annotation, *Specific Performance of Sale of Goods Under UCC § 2–716*, 26 A.L.R.4th 294 (1983)).

Given the centrality of the replaceability issue in determining the availability of specific relief under the UCC, a pleader need allege only the difficulty of cover to state a claim under that section. Magellan has done that (Complaint ¶ 42).

### Count III: Trade Secret Misappropriation

■ Magellan finally advances a claim for violation of the Secrets Act. By definition a trade secret is information that (765 ILCS 1065/2(d)):

> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

In pleading terms, such cases as *Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir.1992) teach that conclusory allegations are sufficient as long as they provide fair notice of the plaintiff's claims.

---

**15.** See generally Steven Walt, *For Specific Performance Under the United Nations Sales Convention*, 26 Tex. Int'l L.J. 211 (1991), which takes the position that given the Convention's documentary history and given domestic caselaw, specific performance should be routinely available under the Convention.

**16.** Because the Convention does not have a replevin provision similar to UCC § 2–716(3), Convention Art. 28 renders such relief unavailable under Complaint Count II.

To state a claim of the type sought to be advanced in Count III, Magellan must provide appropriate allegations that the information at issue (1) was indeed a trade secret, (2) was misappropriated and (3) was used in defendant's business (*Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir. 1992) (per curiam)). Here Magellan alleges only that its purported trade secrets are "sufficiently secret" and "the subject of reasonable efforts to maintain their secrecy" (Complaint ¶ 45).

But even though the federal notice pleading regime makes conclusory allegations permissible (*Neitzke v. Williams*, 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Denton v. Hernandez*, 504 U.S. 25, 31, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992); and relatedly, see the opinion of our Court of Appeals in *Jackson v. Marion County*, 66 F.3d 151, 153–54 (7th Cir. 1995)), such mere rote repetition of the statutory language does not suffice. Those references to "sufficiently secret" and to "reasonable efforts" say nothing at all about what Magellan assertedly did to assure the confidentiality of its alleged trade secrets. Complaint ¶ 9 stands alone with its reference to a statement in Magellan's February 3 letter that the "requirements have not been given by us to any other company or individual for submittal to the subject supplier." But that statement was totally lacking in any warning to Saltzgitter that it could not sell the *goods* embodying Magellan's specifications, as contrasted with its not revealing the specifications themselves to anyone (other than to fabricator DSS, of course).

In that regard, Magellan's entire trade secret presentation has really muddied the waters. Its Complaint did not provide the necessary identification of just what it claimed to be its "trade secrets" entitled to judicial protection. What has since emerged from the parties' briefing is that those claimed secrets are Magellan's *specifications* for the steel that it was purchasing from Saltzgitter—yet Magellan is somehow seeking protection for the manu-factured steel itself. By doing that Magellan has clarified itself right out of court, for it is obvious that the steel as such cannot be the subject of trade secret protection. After all, Magellan of course contemplates no effort to keep the steel under lock and key—instead it has ordered the steel so it can in turn sell the steel to its customers. And if the information that it really seeks to be kept secret (the specifications) were to be apparent or readily derivable from the product said to embody the secret (the steel itself), it would not be a "secret" at all.

For much the same reason, Magellan's allegation as to claimed misappropriation is equally deficient. Although Magellan claims its trade secrets have been or will be misappropriated by Saltzgitter, again the only specific acts to which the Complaint refers are Saltzgitter's attempts to sell the manufactured steel to Magellan's customers. That does not state a claim of threatened (much less actual) misappropriation, for it does not say that Salzgitter has in fact used or threatened to use the asserted trade secrets themselves, or even that it will inevitably do so (*Teradyne, Inc. v. Clear Communications Corp.*, 707 F.Supp. 353, 357 (N.D.Ill.1989)). On the contrary, what Magellan says is essentially "that defendant[ ] could misuse plaintiff's secrets, and plaintiff[ ] fear[s it] will" (*id.*) But even when a defendant is in possession of secret information, disclosure or use of that information is not inevitable (*PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir.1995), quoting *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1207 (7th Cir.1987)).

By way of illustration of all facets of the Count III claim, suppose that the buyer in this deal had been Coca–Cola rather than Magellan and that the Coca–Cola formula rather than steel specifications had been given to Salzgitter for communication to a manufacturer. That improbable scenario is posed precisely because just about everyone recognizes the complete formula for Coca–Cola to be the paradigmatic

trade secret—one of the best-kept secrets in the world (see *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.,* 107 F.R.D. 288 (D.Del.1985)).

But assume the opposite—assume, to parallel the Magellan–Salzgitter situation, that the formula's secrecy was *not* a matter of common knowledge, that the formula was not marked "Confidential," that no confidentiality agreement was signed by the parties and that no other measures were taken to ensure the secrecy of the formula. In those circumstances no court would compel Salzgitter to maintain the secrecy of that information.

By the same token, if that assumed deal happened to go south, no court would step in to stop Salzgitter from selling the cans of soft drink manufactured pursuant to the formula. Indeed, if it had been Coca–Cola that breached the contract, Salzgitter would be expected to do precisely that. If the law were otherwise, every seller of specially manufactured goods could effectively be prevented from reselling the goods by the simple expedient of the breaching buyer crying "trade secret misappropriation." Absurd.

This case is no exception. For more than one reason, then, Complaint Count III fails to state a claim upon which relief may be granted.

### Conclusion

It may perhaps be that when the facts are further fleshed out through discovery, Magellan's claims against Salzgitter will indeed succumb either for lack of proof or as the consequence of some legal deficiency. But in the current Rule 12(b)(6) context, Salzgitter's motion as to Counts I and II is denied, and it is ordered to file its Answer to the Complaint on or before December 20, 1999. As to the Count III trade secret claim, however, Salzgitter's motion to dismiss is granted without prejudice.