LEGGETT & PLATT, INCORPORATED, Plaintiff–Appellant,

v.

HICKORY SPRINGS MANUFACTURING COMPANY, Defendant–Appellee.

No. 01–1255.

United States Court of Appeals, Federal Circuit.

April 2, 2002.

Rehearing and Rehearing En Banc Denied May 9, 2002.

District of Illinois determined that Hickory Springs Manufacturing Co. (Hickory) did not infringe claims 4 and 5 of Leggett & Platt, Inc.'s (L & P) U.S. Patent No. 5,052,064 (the '064 patent) either literally or under the doctrine of equivalents. *Leggett & Platt, Inc. v. Hickory Springs Mfg.*, 132 F.Supp.2d 643, 653 (N.D.Ill.2001). The district court also determined that Hickory did not misappropriate L & P's trade secrets. *Id.* Because genuine issues of material fact preclude summary judgment on infringement of the '064 patent under the doctrine of equivalents and trade secrets violations, this court affirms-in-part, reverses-in-part, and remands.

I.

The '064 patent issued on October 1, 1991 to Robert C. Hagemeister, Steven E. Ogle, and Thomas J. Wells. The inventors assigned the patent to L & P. The patent claims a stackable bedding foundation, often known as a box spring assembly. The patent's "Background of the Invention" explains that prior art box spring assemblies are bulky and costly to ship to the manufacturer for application of padding and covering. To reduce the shipping space requirements for bulky box spring assemblies, "it is customary to compress the assemblies to reduce their individual thicknesses and, when compressed, to tie them in their compressed state." '064 patent, col. 1, ll. 17–19. The '064 invention addresses these problems. The patent claims a box spring that is "nestably stackable." In other words, the claimed box springs stack within other box spring assemblies for transportation "without having to compress and tie the assembly." *Id.* at col. 1, ll. 28–29.

Hickory's accused product is known as the PowerStack. Whether the accused

Lawrence G. Kurland, Bryan Cave LLP, of St. Louis, MO, argued for plaintiff-appellant. With him on the brief were Thomas C. Walsh; David A. Roodman and K. Lee Marshall.

Donald W. Rupert, Mayer, Brown & Platt, of Chicago, IL, argued for defendant-appellee. With him on the brief were Robert F. Finke and David M. Thimmig.

Before CLEVENGER, RADER, and BRYSON, Circuit Judges.

RADER, Circuit Judge.

On summary judgment, the United States District Court for the Northern

product infringes the patent literally or under the doctrine of equivalents turns upon one limitation in the claims. Claims 4 and 5 of the '064 patent are at issue. Claim 4 reads:

    4. A nestably stackable assembly for use in a bedding foundation comprising a rectangular border wire having two parallel sides and two parallel ends,

transversely-spaced, parallel, and longitudinally-extending *support wires* parallel to said border wire sides and having ends connected to said border wire ends, said support wires being formed so as to be generally corrugated along their lengths, said corrugatedly formed support wires having peaks and valleys, said peaks being flattened at their tops, said flattened peaks being generally coplanar with a plane defined by said border wire, said valleys being vertically displaced beneath and intermediate of said flattened peaks, and

longitudinally-spaced, parallel, and transversely-extending upper connector wires parallel to said border wire ends and having ends connected to said border wire sides, said upper connector wires being connected intermediate of their ends along their lengths to said flattened peaks of said support wires.

'064 patent, col. 4, ll. 60–68, and col. 5, ll. 1–14 (emphasis added).

Fig. 6 shows the "corrugatedly formed support wires having peaks and valleys":

**FIG. 6**

On April 20, 1999, L & P filed an action in the district court, alleging that Hickory's box spring assembly, PowerStack, infringed L & P's '064 patent. L & P also charged Hickory with patent infringement under 35 U.S.C. § 271(b) (inducing third parties to infringe), tortious interference with contract, and misappropriation of trade secrets. On August 3 and 10, 2000, the district court held a *Markman* hearing to construe the meaning of the disputed claim term "support wires." In its September 5, 2000 opinion, the court determined that " ' 'support wires' require that the wire be a continuous strand of wire which may be formed by butt-welding, end to end, shorter segments of wire.' " *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,*

2000 WL 1269363, at *7 (N.D.Ill.) (citations omitted). After granting L & P's motion to reconsider, the court decided to clarify the definition to include welds other than butt-welds and explained that " 'a support wire, regardless of how many original pieces it had prior to welding (i.e., if welded at all), must have only two ends.' " *Leggett & Platt,* 132 F.Supp.2d at 645 (citations omitted).

The parties filed cross motions for summary judgment, with Hickory asking for summary judgment on all four counts and L & P seeking partial summary judgment only on the tortious interference and trade secret counts. The district court granted Hickory's motion for summary judgment, and denied L & P's motion for partial

summary judgment. L & P appeals the summary judgment of non-infringement and no misappropriation of trade secrets. This court has jurisdiction under 28 U.S.C. § 1295(a)(1) (1994).

## II.

■ This court reviews grants of summary judgment without deference. *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1353, 47 USPQ2d 1705, 1713 (Fed. Cir.1998). This court must decide for itself "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making this determination, this court views the record in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 672, 15 USPQ2d 1540, 1542–43 (Fed.Cir.1990). "Infringement under the doctrine of equivalents requires an intensely factual inquiry." *Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1381, 54 USPQ2d 1841, 1844 (Fed. Cir.2000). Thus, this court will only affirm the district court's grant of summary judgment if the record contains no genuine issue of material fact and leaves no room for a reasonable jury to find equivalence. *Id.; Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1876 n. 8 (1997).

■ An infringement analysis requires the trial court to determine the meaning and scope of the asserted patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). As a general rule, terms in a patent claim receive their plain, ordinary, and accepted meaning within the community of those of ordinary skill in the relevant art. *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299, 53 USPQ2d 1065, 1067 (Fed. Cir.1999). A "heavy presumption" favors this accepted meaning. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989, 50 USPQ2d 1607, 1610 (Fed.Cir. 1999). To discern accepted meaning, however, the construing court consults the specification and relevant prosecution history to provide context for understanding the meaning of the terms to one of skill in the art at the time of invention. *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1309, 51 USPQ2d 1161, 1169 (Fed.Cir.1999). In consulting the specification, however, the interpretative process may not import limitations from the specification into the defining language of the claims. *Intervet Am., Inc. v. Kee–Vet Labs., Inc.*, 887 F.2d 1050, 1053, 12 USPQ2d 1474, 1476 (Fed.Cir.1989).

■ In the present case, L & P contends that the term "support wires" includes an assembly of separate wires welded together. In sum, L & P argues that "support wires" are merely the wires that absorb any vertical load on the bedding foundation. Because the invention depicts welds joining the wires to support a vertical load, L & P's proposed claim construction would consider the entire '064 assembly a single wire.

At the outset, the claim recites "support wires" in the plural, thus requiring more than one welded "support wire." The

specification does not set forth any definition of the term "support wires." Instead the specification describes "support wires" in language that tracks closely the claim language. '064 Patent, col. 1, ll. 44–49. The specification does, however, refer to a number of other wires—for example, a border wire and connector wires. Thus, the specification distinguishes support wires from other types of wire. The specification identifies these separate wires as performing different functions, such as connecting or forming a border. When discussing welds to join separate wires, the specification retains the distinguishing name and identity of each joined wire. *See, e.g.,* '064 Patent, col. 3, ll. 3–5. Finally, the specification expressly refers to "support wire ends," which attach to the border wire. '064 Patent, col. 2, ll. 57–59. Because the figures depict the support wires stretching from one border to the other, the specification suggests that the support wire ends attach only to the borders. The specification does not mention any support wire ends other than those attached to the border wire. Thus the specification does not discuss a "support wire" composed of multiple wires welded together and, consequently, having a number of ends.

Turning to the prosecution history, the '064 patent application issued without any amendments. Stating the reasons for allowance, the examiner detected three main differences between the '064 invention and the three prior art references. None of these differences addresses "support wires" made of two or more wires welded together. In sum, the district court correctly construed the term "support wires" to mean "a continuous strand of wire" with "only two ends."

■ After claim construction, an infringement analysis compares the properly construed claim with the allegedly infringing devices. *Markman,* 52 F.3d at 976. "To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims." *Mas–Hamilton Group v. La-Gard, Inc.,* 156 F.3d 1206, 1211, 48 USPQ2d 1010, 1014 (Fed.Cir.1998).

■ In this case, the claims require the support wires to be, *inter alia,* "generally corrugated along their lengths" and "[have] peaks and valleys, said peaks being flattened at their tops, said flattened peaks being generally coplanar with a plane defined by said border wire, said valleys being vertically displaced beneath and intermediate of said flattened peaks." '064 patent, col. 4, l. 68, col. 5, ll. 1–6, col. 6, ll. 8–14. Furthermore, the claims require that the "upper connector wires [be] connected intermediate of their ends along their lengths to [the] flattened peaks of [the] support wires." *Id.* at col. 5, ll. 10–13, col. 6, ll. 18–21. Because a "support wire" is continuous with only two ends, Hickory's PowerStack device does not have support wires that fit this claim meaning. The PowerStack product features support cups. These support cups do not fit the definition of a "support wire" in claims 4 and 5 of the '064 patent. Properly construed, a "support wire" has only two ends. The PowerStack support cups are wire baskets welded to longitudinal end-to-end wires. Thus, the support cups have ends welded to the longitudinal wires which themselves have other ends joining to the borders. This combination has more than two ends, in contrast to the "support wires" in the claim. Accordingly, this court affirms the district court's summary judgment of no literal infringement of the '064 patent.

III.

■ Infringement under the doctrine of equivalents requires that the accused

product contain each limitation of the claim or its equivalent. *Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040. "A claim element is equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device." *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423, 44 USPQ2d 1103, 1106 (Fed.Cir.1997). "Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to this determination." *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1315, 47 USPQ2d 1272, 1276 (Fed. Cir.1998).

■ This court must inquire whether a particular combination of support cups and wires in the PowerStack product is the equivalent of the support wires in the '064 patent. While conceding that its product satisfies the function and result prongs of the *Graver* test, Hickory contends that its PowerStack product does not achieve the result in substantially the same way as the '064 invention. *Graver Tank & Mfg. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

The PowerStack product achieves the "nestably stackable" result of the '064 invention by utilizing a number of separate three-dimensional support cups, which are welded to a combination of border wire, cross wires, and long wires, rather than end-to-end support wires. Other than citing to its own patent covering the Power-Stack's support cup assembly as evidence that "the change [from the prior art] is substantial," Hickory does not offer additional evidence such as expert testimony on the substantially different way these support cups achieve the "nestably stackable" result. As noted, the issue of whether the support cups function in substantially the same way as the "support wires" described in the '064 patent is intensely factual.

The record contains evidence from one of the '064 inventors (Wells) and from a technical expert (Creighton) alleging that the accused box spring assemblies infringe under the doctrine of equivalents. Specifically, Mr. Wells' declaration notes: "I actually removed these superfluous wires from an actual Powerstack product and observed that the product still performed the exact same function, in the same way, to achieve the exact same results, as what is called for item by item in claims 4 and 5 of the '064 patent." Wells Decl. ¶ 5. Professor Creighton from the University of Missouri—Columbia testified:

> In my opinion, each corresponding element of Hickory's nestably stackable PowerStack product performs 'substantially the same function, in substantially the same way, to achieve substantially the same result' as the elements recited in claims 4 and 5 of the '064 patent. Additionally, the differences, if any, between the corresponding elements in the Hickory PowerStack product and those in claims 4 and 5 of the '064 patent are insignificant and insubstantial.

Creighton Decl. ¶ 25. Both Mr. Wells and Professor Creighton supported these statements with analysis of the claims and the PowerStack product.

■ Despite the apparent factual disputes over equivalents in the record, the trial court summarily concluded that the support cups in the PowerStack achieved the "nestably stackable" result in a substantially different way from the support

wires in the '064 patent. The district court's conclusion did not supply a legal reason to reject the factual allegations of Mr. Wells and Professor Creighton. Because infringement under the doctrine of equivalents often presents difficult factual determinations, a summary conclusion that a reasonable jury could not find infringement is often illusive. *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1372, 60 USPQ2d 1437, 1440 (Fed.Cir.2001); *Ethicon Endo–Surgery*, 149 F.3d at 1320–21. Moreover, summary judgment procedures require the district court to draw reasonable inferences in favor of L & P, the non-movant. *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1324, 59 USPQ2d 1823, 1828 (Fed.Cir.2001). In the present case, the trial court did not do so. Drawing all reasonable inferences in favor of L & P, the record—including the affidavits from Mr. Wells and Professor Creighton—shows a genuine issue of material fact. This lingering issue of fact precludes summary judgment of non-infringement under the doctrine of equivalents.

Summary judgment is appropriate only when "the evidence is such that no reasonable jury could determine two elements to be equivalent." *Warner–Jenkinson*, 520 U.S. at 39 n. 8, 117 S.Ct. 1040. In this case, because PowerStack's support cups are constructed having the same shape, dimensions and interval spacing corresponding to the peaks and valleys in L & P's corrugated support wires, a reasonable jury could find that PowerStack's support cups

function in the same way and are equivalent to the support wires claimed in the '064 patent. In sum, a genuine factual issue about infringement under the doctrine of equivalents obstructs entry of summary judgment. The district court erred in granting summary judgment.

### IV.

■■■■ Trade secret misappropriation is a matter of state law. *Group One v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1049, 59 USPQ2d 1121, 1127 (Fed.Cir.2001). Thus, the Illinois Trade Secrets Act (ITSA), enacted in 1988, 756 Ill. Comp. Stat. § 1065 (West 1995) (formerly Ill.Rev. Stat.1991, ch. 140, para. 351–59) and the common law of Illinois govern this case. *C & F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1302, 55 USPQ2d 1865, 1868 (Fed. Cir.2000). The Illinois law of trade secret misappropriation * requires L & P to show that its confidential information was: "(i) secret (that is, not generally known in the industry), (ii) misappropriated (that is, stolen from it rather than developed independently or obtained from a third source), and (iii) used in the defendants' business." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir.1992) (citing Ill.Rev.Stat.1991 ch. 140 para. 352(d)); *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d 919, 927 (N.D.Ill.1999); *Strata Mktg., Inc. v. Murphy*, 317 Ill.App.3d 1054, 251 Ill.Dec. 595, 740 N.E.2d 1166, 1176 (2000).

* Under Illinois law, a trade secret is defined as any information sufficiently secret to derive economic value from not being generally known by persons who can obtain economic value from it, and subject to reasonable efforts to maintain its secrecy. 756 Ill. Comp. Stat. § 1065/2(d). Misappropriation is: (1) the acquisition of a person's trade secret by another who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of trade secrets without express or implied consent from the owner to the person using or disclosing the trade secret where that person (a) used improper means to acquire it or (b) knew or had reason to know that it was acquired improperly. 756 Ill. Comp. Stat. § 1065/2.

On trade secret status, the district court found that both parties have produced evidence sufficient to show a genuine issue of material fact. The court also found a genuine issue of fact regarding misappropriation. Nevertheless, the court granted summary judgment in favor of Hickory because it concluded that L & P did not show sufficient evidence that Hickory used L & P's trade secret. Specifically, the district court found that L & P had not designated "specific facts showing that there is a genuine issue for trial" as required by Rule 56(e). *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

To satisfy the use requirement, L & P must show that Hickory could not have created its product without the use of L & P's trade secrets. *Mangren Research & Devel. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 944 (7th Cir.1996). L & P's evidence alleges that Hickory had access to L & P's trade secrets through L & P's former employee Robert Hagemeister. Then L & P also points out similarities between those trade secrets and Hickory's drawings and products. These showings—access and similarity—may support a trade secret misappropriation claim. *See Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1429 (7th Cir.1994) ("While there was no direct evidence that [defendant] used [plaintiff's] confidential information ... the jury apparently inferred from the fact that the [defendant] has access to [plaintiff's] confidential information and from the similarity between the two devices that [defendant] misappropriated [plaintiff's] trade secret ....").

Specifically, on the issue of access, L & P proffers Hickory's hiring of L & P's former employee Hagemeister (also an inventor of the '064 patent) as a consultant for a nestably stackable box spring design project. L & P also alleges that Spiller and McCraw, the two individuals responsible for the development of the Power-Stack, had access to Hagemeister's trade secret information from L & P. On the similarity question, L & P points again to the testimony of its technical expert, Professor Creighton, that Hickory's designs and manufacturing processes are substantially similar to L & P's trade secrets.

As with the issue of infringement under the doctrine of equivalents, the district court prematurely dismissed L & P's evidence on access and similarity. On the issue of access, direct evidence is rarely available, thus requiring a reliance on circumstantial evidence. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (holding under the ITSA that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."). As a former employee of L & P and an inventor of the '064 invention, Hagemeister is a veritable repository of information on L & P's products and designs. When hired by Hickory to design directly competing products, Hagemeister would be hard pressed to avoid disclosing such information. *Id.* Indeed, the record shows that two individuals from Hickory, Spiller and McCraw, had access to L & P's unfiled patent application containing confidential material.

On the issue of similarity, Hickory offers testimony from Mr. McCraw and its expert Dr. Stoll to show substantial differences between Hickory's designs and manufacturing processes and those of L & P. Nonetheless, Professor Creighton testified to the contrary. While disagreements do not always create genuine issues of materi-

al fact, the conflicting allegations of the experts here leave unresolved factual disputes. *Hilgraeve Corp. v. McAfee Assocs., Inc.,* 224 F.3d 1349, 1352, 55 USPQ2d 1656, 1659 (Fed.Cir.2000). Furthermore, summary judgment is inappropriate where, as here, a case may ultimately turn on the credibility of witnesses. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Accordingly, drawing all reasonable inferences in favor of L & P, this court finds a genuine issue of material fact precluding a grant of summary judgment on Hickory's use of L & P's trade secrets.

## CONCLUSION

The district court correctly construed the disputed claim term and hence found no literal infringement. Genuine issues of material fact, however, preclude summary judgment on infringement under the doctrine of equivalents and trade secret misappropriation.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.*